UNITED STATES *v.* WECKER & Co. (No. 3059 [1])

[1] T. D. 42837.

United States Court of Customs Appeals, June 11, 1928

*Charles D. Lawrence*, Assistant Attorney General (*Oscar Igstaedter*, special attorney, of counsel), for the United States.

*Brooks & Brooks* (*Frederick W. Brooks, jr.*, of counsel) for appellee.

[Oral argument May 31, 1928, by Mr. Igstaedter and Mr. Brooks]

Before GRAHAM, Presiding Judge, and SMITH, BARBER, BLAND, and HATFIELD, Associate Judges

GRAHAM, Presiding Judge, delivered the opinion of the court:

The appellee, as consignee, imported at the port of New York 30 shipments of cotton velveteen between November 11, 1924, and December 14, 1925, inclusive. These were appraised by the local appraiser on the basis of a foreign valuation. The importer, in each instance, appealed for reappraisement. After a hearing before Associate Justice Weller an opinion was duly filed and an order entered that "the invoice values are sustained." The importer duly made application for a review of this decision, and thereafter, on December 24, 1926, the Customs Court reversed and remanded the cause for further proceedings, on the ground that certain documentary evidence offered in evidence did not appear to have been admitted or otherwise passed upon by the associate justice. Thereafter the associate justice made a further order in the cause, in and by which order the appraised values were affirmed. The importer again applied for a review by the Customs Court, and, on a hearing, an order was entered by a majority of the court, McClelland, J., dissenting, to the effect that the imported merchandise was not shown to have a foreign or export value, and that the same should be appraised and is dutiable at the United States value thereof under section 402 (d) of the Tariff Act of 1922, which dutiable value was duly found by said court and stated in its opinion filed therein. As to certain other items of importation as to which the importer had offered no evidence the appraised value was affirmed.

The Government has appealed from this judgment, and assigns as error the finding of the Customs Court that no foreign or export value existed and that the United States value thereof should be taken; and, further, that the court failed to find that similar merchandise was freely offered for sale to all purchasers in the principal markets in the country of exportation, as provided in section 402 (b) of the Tariff Act of 1922.

In assigning its errors, the Government, in assignment No. 6, makes the following statement:

6. In not finding that—
(1) Quality No. 2770 is similar to quality No. KC 70.
(2) Quality No. 3690 or 3600 is similar to KC 90.
(3) Quality No. 2753 is similar to quality SK 29.
(4) Quality No. 3668 is similar to quality No. SK 90.
(5) Quality No. 1082 is similar to quality No. G 18¼.

In argument before this court, and in its brief filed herein, the Government concedes that no export value exists for the goods in question; that the only issue involved here is whether the goods have a foreign value or whether they should be appraised at their United States value; that if the court below has properly found the United States value to be the dutiable value, then said court has returned and found a correct value; that the imported goods are not sold in the country of exportation, but that similar goods are. No claim is made as to similarity with any other goods so sold, except the qualities named in the sixth assignment of error, above quoted.

The matter, therefore, resolves itself into the single inquiry: Is there substantial evidence in the record in support of the finding of the Customs Court that the German qualities above named are not similar to the imported goods?

We have, on numerous occasions, held that if there be substantial evidence in the record to support the finding of the Customs Court in reappraisement matters, we will not disturb such finding. This rule is not only based upon the statute (sec. 501, Tariff Act of 1922), but is one, also, based on reason. It was not the intent of the Congress that this court should pass upon the facts in reappraisement matters, but might intervene only when the lower court acted without warrant of law, contrary to the statutes, or in contravention of well-established principles of customs law or practice. Under the reappraisement provisions of the Tariff Act of 1922 (sec. 501) the single associate justice had the witnesses before him and the advantage of hearing their testimony and of observing their demeanor while so testifying. When the cause came on to be heard on review before the Customs Court that court was given, by the statute, the right to examine the record for errors, both of law and of fact. When the cause came to this court, therefore, two courts having already passed upon the questions of fact involved, the law has wisely provided that such questions of fact must be considered as settled. It may well be that in many instances this court might differ with the court below in its determination of the facts involved and the weight to be given to certain evidence. But such is not our function. In instances, therefore, where there is a conflict as to a determination of fact, the parties must seek and obtain their relief, if at all, in the court below, and not here. It is only when the court below has erred to

the extent that it becomes matter of law that we may interfere. These observations are particularly applicable in the case at bar, where it is vigorously insisted by the Government that the findings below are plainly contrary to the weight of the evidence.

In *United States* v. *Irving Massin & Bros.*, 16 Ct. Cust. Appls. 19, T. D. 42714, we found it necessary to discuss the meaning of the word "similar" as it appears in section 402 (b) of the Tariff Act of 1922. We there said:

In view of the common meaning of the word "similar" and of the authorities cited, we are of opinion, and so hold, that if goods are made of approximately the same materials, are commercially interchangeable, are adapted to substantially the same uses, and are so used, ordinarily they are similar, within the meaning of section 402 (b). The importer or foreign manufacturer may not, by making a few changes in structure, or in giving the product a new name, or by restricting its sale to the American purchaser only, *ipso facto* remove his merchandise from section 402 (b), the foreign-value provision.

It may be said in this connection that the statute plainly provides that the dutiable value of the imported goods shall be fixed at the market value or price of such or similar goods offered for sale abroad. It can not, therefore, be fixed by comparison, by taking some proportionate part of the foreign value of comparable goods of different grade or value. It must be *the value or price* of *such* or *similar* goods.

The imported material and the German goods claimed to be similar are cotton velveteens of various colors. Nothing is disclosed by the record as to their uses or capability for use. It nowhere appears whether the German materials can be used for the same purposes as the imported materials.

The Government produced six witnesses who were American importers of velveteens, and who testified, in substance, that they would accept the imported materials as a good delivery on orders for the German alleged similar qualities. On the other hand, the importer called three witnesses who testified, in substance, that they would not accept deliveries of such imported goods for the German qualities. A fair example of this testimony is that of Harry C. Hutchins, who testified that he would not accept as a good delivery imported material No. 1082 for the German goods G 18¼; that it was not of as good quality, did not cover as well on the face, did not appear to have as much pile on its face, the back could be seen more easily, and it was not finished as well; that he would not accept quality 2700 as a good delivery for German quality SK 29; that it did not cover as well and was not finished or dyed as well; that the back could be seen much more easily; that he would not accept imported material 3690 for German material KC 70; that it was lighter in weight, did not cover as well, and the back could be seen more easily; that imported material 3600 was not a good delivery for German material SK 90, which covers better and looks to be dyed and finished better; that he would not accept imported mate-

rial 3668 for German material SK 90; that it does not cover so well and the back could be seen more easily; that he would not accept imported material 2770 as a good delivery for German material KC 90, KC 70; that there was not an awful lot of difference between them, and that the color makes some difference, and makes the latter look better; that finish and weight of fabric, and count of threads, is an essential element in the value of velveteens.

This witness, and the witness Loweth, stated that there was not much difference between imported quality 2770 and German quality KC 70 and KC 90, as shown by Exhibit 22. However, both witnesses seem to agree, as did the witness Herman Hartman, that the imported goods and the German qualities claimed to be similar were not commercially interchangeable, and would not be accepted by merchants as good deliveries for each other.

In addition to this testimony several affidavits were introduced, as well as a number of letters written by Wecker & Co., and two special reports of customs agents made August 20, 1925, and February 19, 1927, respectively. The latter report, especially, shows that the imported materials are not made and processed in the same manner as the comparable German velveteens. The report, quoting from the German manufacturer, is, in part, as follows:

> We desire to emphasize again that the American qualities are made of cheaper raw material, although they may appear similar to the qualities produced for the home market.

> We desire, furthermore, to point out again that the American qualities are manufactured in a different manner from those produced for the home market. There is a considerable difference between the qualities made for the United States and for Germany, not only in the process of dyeing, but in the finishing as well, so that the cost of production for the former is essentially lower than for the latter.

Exhibits 8 and 9 are affidavits executed by one Paul Mengers, a representative of the consignors of the imported goods in question. In these exhibits he details the differences in construction and quality of the imported goods and the comparable German qualities. It is shown thereby, and by Exhibit 29 aforesaid, that the imported materials are made of cheap and coarse yarns, while the German materials are made of a better quality of yarn; that the German goods are brushed, sheered, singed, dyed, finished, and waxed a greater number of times than the imported materials; that there is a greater amount of waste on the German goods than on the imported materials; that a much longer time is required for the manufacture of the German goods than the imported goods. None of these differences are denied by any evidence produced by the Government.

Applying the rule laid down in the *Massin* case, *supra*, we must come to the conclusion that there is substantial evidence in the record in support of the judgment of the court below, finding that

the imported goods are not similar to the comparable German qualities. There is some substantial evidence that the goods are not made of approximately the same material and that they are not commercially interchangeable. We have already adverted to the fact that there is no proof in the record of any kind as to their use or adaptability therefor.

The individual differences between the foreign-market products and those imported in texture, workmanship, or structure might not be, in themselves, sufficient to prevent the goods from being similar. But, taken together, and added to a consideration of the facts, or lack of facts, shown by this record, we are unable to say the court below erred in finding the goods to be not similar. The question of similarity is, in each case, to be measured by much the same homely rule that applies to the prospective customer who enters a store seeking some utilitarian article of a certain specified name and style; he finds the article requested is not in stock but that another article, of approximately the same price and which will perform the same functions, is capable of the same use and may be substituted therefor, is available. Such an article is a similar article, notwithstanding the price, the methods of construction, and the component materials may be somewhat different; but, for all utilitarian purposes, one is a substitute for the other. It is in this sense, we believe, that the word similar was used in said section 402 (b).

The matter presented being a question of fact, and the court below having found adversely to the Government upon that issue, and there being substantial evidence in the record in support of the judgment of the court below, it should be and is hereby *affirmed*.