(Reap. Dec. 9435)

KURT ORBAN COMPANY, INC. *v.* UNITED STATES

Entry Nos. J–692; J–693.

(Decided May 27, 1959)

*Sharretts, Paley & Carter* (*Howard Clare Carter* of counsel) for the plaintiff.
*George Cochran Doub*, Assistant Attorney General (*Mollie Strum* and *Daniel I. Auster*, trial attorneys), for the defendant.

LAWRENCE, Judge: The above-enumerated appeals for a reappraisement presenting the question of the proper dutiable value of certain deformed reinforcing bars imported from Belgium were consolidated for the purposes of trial and determination.

Appraisement of the merchandise was made on the basis of foreign value of such or similar merchandise, as that value is defined in section 402 (c) of the Tariff Act of 1930 (19 U.S.C. § 1402 (c)), as amended by the Customs Administrative Act of 1938.

It is the contention of plaintiff that export value of such merchandise within the purview of section 402(d) of said act (19 U.S.C. § 1402(d)) is the proper basis of value for the instant merchandise.

The parties, subject merchandise, and the issue here presented are similar to those in the case of *Kurt Orban Co., Inc.* v. *United States*, 42 Cust. Ct. 644, Reap. Dec. 9434, decided concurrently herewith.

In support of appraisement on the basis of export value of such merchandise, plaintiff offered in evidence an affidavit of Bertinchamps Celestin, chief clerk of Emile Regniers & Co. of Brussels, Belgium, the seller of the deformed steel reinforcing bars in controversy. Said affidavit was received in evidence as plaintiff's exhibit 1. As exhibits 2 and 3, there were received on behalf of plaintiff the commercial and consular invoices accompanying entry J–692, covered by reappraisement appeal 237472–A, and the like invoices accompanying entry J–693, covered by reappraisement appeal 237473–A.

The evidence offered on behalf of defendant consists of the testimony of Walter Diamond, appraiser of merchandise at Jacksonville, Fla., port of entry of the instant merchandise, and the testimony of Philip Grossman, customs examiner at the port of New York, together with customs Form 6431 with accompanying papers which were received in evidence as defendant's collective exhibit C in the case of *Kurt Orban Co., Inc.* v. *United States*, Reap. Dec. 9434, referred to, *supra*.

The affidavit of Bertinchamps Celestin (exhibit 1) is here quoted in its entirety:

Bertinchamps Celestin being duly sworn, says:

I am Chief Clerk of Emile Regniers & Co. located at Charleroi, Brussels, Belgium and have been associated with this company for 47 years.

The business of the company is the sale of various steel products including deformed concrete reinforcing bars for exportation to the United States and to other countries as representatives of various steel mills located in Belgium. During all of the time I have been connected with the company, I have been directly concerned with the sale of the products handled by my company and as a part of my duties I have kept myself fully informed of the prices at which other producers of identical or commercially interchangeable grades and sizes of steel products have offered their merchandise for sale both for consumption in Belgium and for exportation to the United States and to other countries.

I am thoroughly familiar with the deformed concrete reinforcement bars sold to Kurt Orban Co., Inc. of New York City which were covered by their orders of February 17, 1953 and April 25, 1953 which I am informed were the subject of customs entries number J-692 and J-693 at Jacksonville, Florida. The prices shown on the invoices accompanying these shipments truly and correctly show the actual purchase prices paid for the various products by Kurt Orban Co., Inc.

This merchandise was offered for sale for exportation to the United States unconditionally and without any restrictions as to disposition, use, resale price or any other restriction whatsoever and the price did not vary with the quantity purchased. The merchandise was freely offered for sale and sold at the factories of our principals, the producers thereof, and the factories were the only markets in Belgium for the purchase and sale of such merchandise. The purchaser or his agent ordinarily accepts delivery of the merchandise at the factory and all charges arising thereafter are for the account of and are paid for by the purchaser. At times, for the convenience of the purchaser, I offer this merchandise and sell it on an f.o.b. seaport basis and these prices are determined by adding the inland freight and other charges to the ex-factory packed price.

On the respective dates of exportation of the merchandise covered by these orders ½" deformed concrete reinforcing bars, structural grade, were freely offered for sale and sold, as explained in the preceding paragraph, at $82.00 per metric ton f.o.b. Antwerp, plus an extra charge of $1.45 per metric ton because of size, ⅝" deformed concrete reinforcing bars were freely offered for sale and sold, as explained before, at $82.00 per metric ton, all additional charges included, and ⅜" deformed concrete reinforcing bars were freely offered for sale, as aforesaid, at $82.00 per metric ton f.o.b. Antwerp, plus an extra charge of $2.90 per metric ton because of size. These aforesaid prices included inland freight and other charges from the mills to Antwerp of $4.00 per metric ton.

The foregoing prices are contained in the records of my company which were kept under my direct supervision, and which I know to be correct. I have been unable to locate any offers of sale or sales to attach to this statement as corroboration thereof, because such documents have been destroyed.

By reason of my experience, as previously explained, I know that deformed concrete reinforcement bars are not offered for sale or sold in Belgium because there is no demand for such merchandise. It is the practice in Belgium to use round bars which have not been deformed in producing reinforced concrete.

For that reason deformed concrete reinforcement bars are never specified by engineers in Belgium in connection with reinforced concrete, and deformed concrete reinforcement bars are not used or sold for consumption in Belgium. I can recollect a few unusual cases where deformed bars have been sold in Belgium for consumption in Belgium, but in those cases the deformation was different in location, degree of deformation, and nature of deformation from the deformed concrete reinforcing bars that are sold and exported to the United States. Naturally, the deformed bars sold for consumption in Belgium were sold at higher prices because of this special deforming required. Extra charges were also made for bundling the material in the form required by the Belgian users and for handling the material. The merchandise exported to the United States is not packed in bundles but it is packed in lifts weighing from 1 to 2 metric tons each.

In order for a plaintiff in an appeal for a reappraisement to succeed in its contention that export value should be held to be the proper basis of appraisement, it is incumbent upon it to prove the nonexistence of a higher foreign value for such or similar merchandise.

It is considered that the above-quoted affidavit is insufficient in and of itself to sustain such a burden. As to similar merchandise sold for home consumption, the only reference thereto is the statement of Celestin that "It is the practice in Belgium to use round bars which have not been deformed in producing reinforced concrete."

The question of what constitutes "similar" merchandise for reappraisement purposes has been the subject of extensive litigation (*United States* v. *Irving Massin & Bros.*, 16 Ct. Cust. Appls. 19, T.D. 42714, and *United States* v. *Wecker & Co.*, 16 Ct. Cust. Appls. 220, T.D. 42837).

Without further evidence, other than the above-quoted statement of Celestin, as to the dissimilarity of design, character, and use of steel bars used for reinforcing concrete in the country of exportation, the presumption of correctness attaching to the decision of the appraiser is not disturbed. In fact, it would appear to be corroborated by the following question and answer appearing on the consular invoices forming part of plaintiff's exhibits 2 and 3 herein as follows:

Is such or similar merchandise offered or sold in the home market for home consumption? Yes.

which statement was made by the seller of the instant merchandise at the time of exportation thereof and was declared to be a true and correct statement and was authenticated by the United States Consul at Brussels, Belgium.

In the circumstances of the present record, it is apparent that plaintiff has failed to sustain its twofold burden proving the action of the appraiser to be erroneous and of establishing its claimed value as the proper one. *Kenneth Kittleson* v. *United States*, 40 C.C.P.A. (Customs) 85, C.A.D. 502, and the cases therein cited.

Section 2633 of title 28, U.S.C., provides, so far as pertinent here, that "The value found by the appraiser shall be presumed to be the

value of the merchandise. The burden shall rest upon the party who challenges its correctness to prove otherwise." In the case before the court, such proof is found lacking.

Upon the foregoing record, the court finds as follows:

1. That the merchandise involved herein consists of deformed steel bars for reinforcing concrete, which were exported from Belgium.

2. That appraisement of said merchandise was based on the value of such or similar merchandise offered for sale or sold for home consumption.

3. That there is no evidence to establish any other values than those returned by the appraiser.

As conclusions of law, the court holds:

1. That plaintiff has failed to overcome the presumption of correctness attaching to the values found by the appraiser.

2. That foreign value, as that value is defined in section 402(c) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, is the proper basis of value for the merchandise covered by the appeals for a reappraisement herein, and

3. That such value is the values returned by the appraiser.